UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE PROCTER & GAMBLE COMPANY,

      Plaintiff,

v.                                                               Case No. 07-C-883

KIMBERLY-CLARK CORP., et al.,

      Defendants.

**DECISION AND ORDER**

On October 4, 2007, this Court heard Plaintiff Procter & Gamble's ("P&G") motion seeking a temporary restraining order and preliminary injunction against an advertising campaign being run by Defendant Kimberly-Clark ("KC"). This Court denied relief. After some eight months of additional discovery, P&G renewed its motion for a preliminary injunction. Following briefing, a two-day hearing was held on July 10-11, 2008, and the parties have since submitted their respective closing arguments in letter form. Having considered fully the evidence and arguments of counsel, I conclude for the reasons set forth below that the motion should be denied.

**I. Background**

KC makes a line of diapers called Huggies "Natural Fit." Among the distinguishing qualities of these diapers are sides that are contoured towards the center. By being contoured between the baby's legs, the diapers have (KC states) a more "natural" fit than traditional diapers that are not contoured (or less contoured). Huggies' global brand director, Deborah Bauer, testified that the contoured shape was deemed advantageous, a feature that would be viewed positively by

consumers. Reducing the crotch span by some 30%, she believed, would enable KC to advertise a better fit and greater comfort.

To test its assertion about natural fit, KC conducted a test called the "Burke Study," in which KC tested diapers with 2.5-inch and 3-inch crotch widths. KC tested only size 4 of its diapers, under the theory that size 4 was the largest selling diaper size; it also spanned a large number of baby weight ranges. Bauer testified that in her experience it was common to test only one size to establish the merit of a proposed claim, and she stated that babies who wear size 4 diapers engage in many similar activities (crawling, lying down, etc.) as other babies. The intent of the Burke study was to be able to support KC's claims for natural fit and less bulk, and according to Bauer the initial study report substantiated the key advertising claims KC wanted to make, in particular the claim regarding natural fit. (Ex. 37) (The study did not support KC's claim that its diaper was less bulky.) Based on the results of the study, KC decided it could proceed with an ad campaign for its Natural Fit diapers.

KC's line of advertising for its Huggies products extends to television, print and the internet, and the "natural" fit is the common thread in these advertisements. The advertisements claim a more natural fit "across the line," meaning that the claim is not limited to the size 4 diapers KC tested. The parties have referred to the advertising campaign at issue here as the "Brick Baby" campaign, a moniker derived from the fact that in KC's television advertisement the announcer humorously suggests that KC's diapers are designed for "babies of the human variety" while the image on-screen suggests that other diapers are designed to fit inanimate bricks. KC commissioned a study by a company called MSW, which concluded that the ad was very persuasive.

2

Needless to say, P&G did not appreciate KC's attempt at humor, in particular the suggestion that other leading brands of diapers – especially Pampers and Luvs, which were not named specifically but were the clear target of the ads – fit less naturally in comparison to Huggies. In fact, P&G asserts that KC's statement that Huggies "fit more naturally" due to their contoured shape is false. Huggies' contoured shape, P&G asserts, is wholly irrelevant to how the diapers fit. Moreover, P&G asserts that KC's consumer and employee testing does not back-up KC's claim that the diapers fit more naturally, and P&G further argues that its own testing proves that Pampers and Huggies have essentially the same "natural" fitting qualities. Other facts pertinent to the legal issues P&G raises are set forth below where relevant.

**II. Preliminary Injunctive Relief**

When considering a motion for a preliminary injunction, a district court is to first determine whether the moving party has demonstrated some likelihood of prevailing on the merits, and an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant demonstrates both, the court must then consider the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied, and the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 881 (7th Cir. 1997).

**III. Likelihood of Success on the Merits: the Lanham Act**

P&G seeks relief under the Lanham Act for what it views as KC's "false or misleading misrepresentation of fact." 15 U.S.C. § 1125(a)(1). "In order to establish a claim of false or

3

deceptive advertising under § 43(a) of the Lanham Act, a plaintiff must show that the defendant made a material false statement of fact in a commercial advertisement and that the false statement deceived or had the tendency to deceive a substantial segment of its audience." *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007).[1] The principal focus of the parties in this case is whether KC's statement that its diapers have a more natural fit is a false or misleading statement.

**1. KC's Statements are Puffery**

Among the preliminary questions posed by KC's advertising is whether it asserts a "fact" that is materially false. Early in the life of this case, I inquired whether KC's assertion that its diapers "fit more naturally" was really only the sort of nonactionable puffery one commonly finds in advertising. At the July 10 hearing, that question was not probed in detail, although the evidence proffered by P&G strongly suggested (no doubt inadvertently) that the statement is indeed puffery. For the reasons set forth below, I now conclude that KC's assertion that its diapers "fit more naturally" is not actionable under the Lanham Act.

Under the Lanham Act, and elsewhere, puffery comes in two forms. One kind of puffery "puffs" a product in a blustered or exaggerated way known by both the speaker and the audience to be an exaggeration. When an advertiser claims his store that has the "lowest" prices or his product is the "best," no one expects that consumers will take his claims at face-value: there is, for

---

[1]The Seventh Circuit has also framed the analysis as follows: "the plaintiff must show that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir. 1999).

4

such claims, no reliance. *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 160 (2d Cir. 2007) (discussing the two forms of puffery). This form of puffery might be called "exaggeration puffery."

The kind of puffery at issue here is somewhat different. KC has not exaggerated the quality of its product – it does not boast that Huggies are the greatest diapers, for example. The problem is not one of the substance of KC's claims but in the *measurement* of its claims – essentially, KC's claims about its diapers are so vague and subjective that they are neither provable nor disprovable. The claims are puffery for at least two reasons.

### a. KC's Claim Regarding a "More Natural Fit" is Inherently Vague

First, KC's claims about natural fit are vague by their very nature: throughout the briefs and hearing, no one has been able to identify a fixed set of criteria for assessing what it means for something to "fit more naturally." As P&G's witness Dr. Baldwin noted, the concept of "fit" is "very broad" and not susceptible to easy measurement, whereas qualities like leakage, absorption, strength, or the like are actually measurable. Admittedly, the "fit" of a piece of clothing might be measurable – for instance, it might be possible to conclude, by objective measurements, that a Savile Row suit fits a given person better than a wrongly-sized one off the rack. But what does it mean to fit someone "more naturally?" The term "natural," like "organic," is in vogue, but no one can seem to agree on what it means: which garment fits a woman more "naturally" – a tailored English business suit, a Japanese kimono, or an Indian sari?

As Dr. Baldwin testified, "consumers assess fit using a wide variety of performance benefits . . . and what's important to how a diaper fits naturally to one consumer would be different [to other consumers]." Thus, not only are consumers' impressions of quality different, but apparently they cannot even agree on what *criteria* are to be used in judging the "naturalness" of the diapers' fit.

5

This subjectivity was underscored by another of P&G's witnesses, Bret Seitz, who was asked to explain the most important factor that affects "fit." He responded "it's dependent. . . . it's like clothes in general. It has to fit every part." Even the diapers' appearance, he testified, could somehow factor into a respondent's conclusions about natural fit.

In fact, P&G admitted that despite extensive consumer testing it still does not know how consumers actually arrive at a conclusion that a given product fits naturally. In particular, it does not know how consumers weigh all of the different objective and subjective elements that figure into their conclusions on fit. Bret Seitz gave one example of a particular diaper whose "measures that we can quantify" convinced P&G designers that the diaper would be an excellent fit, but the consumers disagreed: "consumer perception, which is always the winner, said 'no.'" Thus, not only do consumers disagree about what factors make a diaper fit more naturally – they can disagree with the manufacturer itself.

In sum, despite extensive briefing and testimony, it is not even clear that the benchmark concept – a "natural fit" – is capable of concrete definition. Because it is not known even what criteria should factor into the definition, it is impossible to conclude with any credibility that one product fits more naturally than another. In other words, given the vagueness of the benchmark claim, KC's claim about natural fit is not susceptible to proof or disproof, and accordingly P&G cannot show KC's claim is false.

**b. "Natural Fit" Cannot be Proven True or False Because it is Based Solely on Subjective Consumer Preference**

If subjectivity plays a role in deciding what it means to "fit more naturally," it plays an even stronger role in *measuring* the "natural fit" of a diaper. That is, even if we could all agree on what

6

it means (in the abstract) for a diaper to fit more naturally, our conclusions as to which diaper actually fit more naturally would be based on purely subjective judgments. Because this kind of "opinion puffery" can only be evaluated based on the subjective opinions of the audience, it cannot be "proved." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 497 (5th Cir. 2000) (noting that whether Papa John's used "better ingredients" or made "better pizza" was simply a matter of opinion). As that court put it, opinion puffery is "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Id.* Opinion puffery is not actionable because the claim is at its essence a statement of subjective opinion rather than fact, and as such a plaintiff in a Lanham Act case cannot ever prove such statements to be "false."

Here, it is clear (as P&G concedes) that the only way of measuring natural fit is through consumer testing. Asked whether he based his conclusions about fit on consumer perceptions, Bret Seitz agreed: "consumer perception, clearly." In fact, P&G's assessment of fit is based solely on mothers' responses to its survey: Seitz testified, "That [consumer testing], at the end of the day, is what tells us we have good fit or not good fit, is the consumer perception." He continued:

> There are a lot of different things that define 'fit'. There are some metrics that we can quantify but there are also some consumer subjective criteria. The population of consumers who use Cruisers is different from the population of consumers who use Baby-Dry, [which] is different than the population of consumers who use Luvs. And their targets for good fit aren't always the same. And so we may internally [at P&G] . . . judge [Cruisers] as having the best fit, it doesn't necessarily mean the consumers would judge that as having the best fit.

P&G seems to argue that because consumer testing is the only way to substantiate a diaper fit claim, such claims are therefore verifiable, for Lanham Act purposes, simply by referring to those tests. That is not true. The fact that consumer testing is the principal method for informing

7

companies about natural fit does not mean it is a legitimate method for proving truth or falsity in the Lanham Act context. The Fifth Circuit's resolution of the issue in *Pizza Hut* is instructive. Papa John's advertising slogan was simple: "Better Ingredients. Better Pizza." The Fifth Circuit reversed the district court and found the statements mere opinions rather than facts capable of being disproved.

> Moving next to consider separately the phrase "Better Ingredients.," the same conclusion holds true. Like "Better Pizza," it is typical puffery. The word "better," when used in this context is unquantifiable. What makes one food ingredient "better" than another comparable ingredient, without further description, is wholly a matter of individual taste or preference not subject to scientific quantification. Indeed, it is difficult to think of any product, or any component of any product, to which the term "better," without more, is quantifiable.

*Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 499 (5th Cir. 2000).

Just as it is impossible to prove which pizza is "better," it is impossible to demonstrate conclusively (for Lanham Act purposes) whether one brand of diapers "fits more naturally." Of course consumer testing would have been available in the *Pizza Hut* case as well, but the point of the decision is that an assertion whose truth depends solely on consumer opinion is an inactionable one. Suppose in the *Pizza Hut* case the plaintiff (Pizza Hut) had produced a study showing that 75% of consumers actually preferred its pizza over the allegedly "better pizza" of Papa John's. That study would have been to no avail in the Lanham Act context, however, because the issue is one of personal preference rather than objective truth. Presumably the plaintiff could have conducted dozens of studies showing that consumers preferred its pizza to Papa John's, but such studies would still not show that Papa John's claim of "better pizza" was "false" for Lanham Act purposes. Whenever subjective preference is the arbiter of a claim – whether of pizza or natural fitting diapers – resort to consumer studies is of limited value in the Lanham Act context and only underscores the

inherent difficulty in disproving such claims. The only thing the testing in this case demonstrates clearly is that consumers cannot agree on which diapers fit more naturally.[2]

Finally, I note that the studies here are not just subjective impressions, they are the impressions of the *consumer* rather than the infant or toddler actually wearing the diapers. To the extent the "fit" of a piece of clothing is measurable, one would think it is primarily a question put *to the wearer* rather than a third party. Because the studies here are based on perceptions of third parties, at best they can be deemed advisory rather than dispositive. (The fact that something like the aesthetics of the diaper apparently plays a role in mothers' perception of "natural fit" is telling.) In sum, P&G asks the Court to find KC's natural fit claim false even when: (1) people cannot agree on what factors make a diaper fit more naturally; (2) the measurement of any of the possible factors is based on subjective consumer perception; and (3) the perception about fit does not even come from the wearer of the diaper itself. For all of these reasons, I conclude that P&G has little likelihood of proving that KC's statements about natural fit are actionable statements under the Lanham Act.

**2. Even if Actionable, P&G has not Shown that KC's Advertising is False**

Above I have set forth the reasons I do not believe KC's statement that its diapers fit more naturally is anything more than puffery. I also conclude, however, that even if its statements were

---

[2] The subjectivity of the question is evident in the results of the consumer studies themselves. For example, P&G's study shows that for several sizes of diapers, 51% of consumers found that Pampers fit more naturally, while 45% preferred Huggies and 4% had no preference. The fact that P&G's study resulted in a "coin toss" underscores the fact that the outcome is based solely on individual preference – *not* on some objective "truth" about the natural fitting qualities of either diaper.

9

Case 1:07-cv-00883-WCG   Filed 08/05/08   Page 9 of 16   Document 86

actionable (that is, capable of disproof), P&G has not met its burden to show that the statements are false.

### a. P&G's Challenge to KC's Testing Methods does not show Falsity

Even if the "natural fit" of diapers were a measurable quality, and even if consumer testing of non-wearers of the product were a reliable method of measuring that quality, P&G's efforts to undermine the validity of the Burke study fail to demonstrate that KC's statements are actually false. First, the Lanham Act does not require testing to support a claim's "truth" – presumably advertisers routinely make countless claims that are both true and *un*tested. Thus, since a consumer test was not even required by the Act, the particular criticisms P&G has leveled at the methods used in KC's Burke study are of only limited relevance.

Second, it is important to understand what KC did *not* claim. In particular, its advertising does not mention any consumer tests – KC simply says its product fits more naturally. Had KC's advertisements cited a consumer test (e.g., "nine out ten moms said Huggies fits more naturally"), P&G's arguments about KC's testing methods or extrapolations would be fair game because the tests in question would be *incorporated* into the advertising claim itself. They are part of the claim alleged to be false. But because KC's advertising simply asserted a position ("Huggies fit more naturally") without referencing any tests, P&G's attacks on KC's test methodology do not directly challenge the truth of KC's claim.

A Florida district court summarized this point as follows:

> unless a claim that a product is "better" than a competitor's is "backed-up" with false allegations that "tests prove" superiority when no such tests or only unreliable tests exist to support such a claim, the superiority claim constitutes no more than unactionable puffery. For non-puffing superiority claims, an affirmative showing that the claim is false is required, i.e. a showing that defendant's product is equal or inferior. In this case, *Defendants have not even implied in their advertisements that "tests prove" superiority of the BioGran® product, thus the existence or reliability*

10

*of tests supporting the statement of superiority is irrelevant*, and as mere puffery, the statement is not actionable as a matter of law under Section 43(a) of the Lanham Act.

*University of Florida Research Foundation, Inc. v. Orthovita, Inc.,* 1998 WL 34007129, 27 (N. D. Fla. 1998) (italics added) (citations omitted).

For example, in *Castrol, Inc. v. Quaker State Corp.,* the defendant had not merely stated that its product was superior, it claimed that *testing* had revealed its product to be superior. In such a case, the testing becomes a key component of the ad's claim, and thus the nature and methods of the tests become crucial:

> plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement. Where the defendant's advertisement claims that its product is superior, plaintiff must affirmatively prove defendant's product equal or inferior. Where, as in the current case, defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited.

977 F.2d 57, 63 (2d Cir. 1992).

As a concrete example of the difference in approach, the Second Circuit discussed a prior case in which Procter & Gamble had been sued for claiming that clinical tests proved its product superior:

> In *Procter & Gamble Co. v. Chesebrough-Pond's, Inc.,* 747 F.2d 114 (2d Cir.1984), for example, Chesebrough alleged the literal falsity of Procter's advertised claim that "clinical tests" proved its product superior. Procter, in return, challenged as literally false a Chesebrough commercial which, making no mention of tests, asserted that its lotion was equal in effectiveness to any leading brand. We explained that in order to prove literally false Procter's claim of "test-proven superiority," Chesebrough bore the burden of "showing that the tests referred to by P & G were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited." We held that Procter could prove false Chesebrough's advertisement, however, "only upon adducing evidence" that affirmatively showed Chesebrough's claim of parity to be false.

*Id.*

11

What these distinctions mean is that when the existence or results of tests are *not* incorporated into the advertisement, as here, a plaintiff may not meet its burden of showing falsity merely by leveling attacks at any tests that might happen to exist; such attacks are simply not affirmative evidence of falsity. It is one thing to say "that is false," but another thing altogether to say "you have no proof." In the Lanham Act context, the latter is not enough. As the court found in *University of Florida Research Foundation, Inc. v. Orthovita, Inc.,* KC has "not even implied in their advertisements that 'tests prove' superiority of" its product; "thus the existence or reliability of tests supporting the statement of superiority is irrelevant." 1998 WL 34007129, * 27. P&G has spent substantial efforts detailing various alleged flaws (discussed below) in the Burke study, but those arguments about KC's consumer testing do not, on their own, suggest that KC's claims are false.

**b. P&G's Own Tests, and its Criticisms of KC's Tests, do not Suggest a Likelihood of Disproving KC's Claims**

I have concluded above that P&G's criticisms of the Burke study do not themselves suffice to meet P&G's burden of proof to show falsity. P&G does argue, however, that its own tests actually *disprove* KC's claims, and if that is true, and if its critiques of the Burke study are meritorious, then P&G could in fact meet its burden to demonstrate falsity. I therefore address the arguments P&G raises that speak to the merits of the natural fit dispute.

As already noted, P&G has criticized the methods KC used in the Burke test. First, it has claimed that the test asked too many attribute questions (twenty-six) and that the intent of the study had more than one purpose. It also argues that the number of questions resulted in a "halo effect," meaning that the questions themselves may have reinforced or altered consumers' opinions. In

12

other words, if a consumer is generally pleased with a product, he will tend to answer a number of questions positively even if those factors did not actually please, or were not considered by, the consumer. It also claims that KC should have tested more sizes of diapers than only size 4 and should not have extrapolated its test results across its entire line of diapers.

Dr. Chambers testified persuasively and extensively that KC's test was generally reliable. He is a member of the American Society for Testing and Materials (ASTM) and a distinguished professor at Kansas State who has devoted some twenty years to the testing of consumer products. He believed that the Burke study sample size of 300 was adequate and that any "halo effect" concerns were minimal because a key question involving "fit" was found in the beginning of the survey. The first question involved overall preference (which KC "won"), and after that, the early questions involved bulk and fit. The existence of the later questions thus could not be expected to have any impact on the earlier questions, he said. Although the specific "natural fit" question came much later in the survey, Chambers testified that there was no demonstrable halo effect within the results of the surveys – the P&G diaper actually "won" on one of the bulkiness questions, meaning that the first question asking about overall preference did not drive the results of the other questions in the survey. Moreover, he testified, there were a large number of attribute questions that had a "no preference" response; had there been a halo effect, these "no preference" answers would have been skewed towards the "haloed," or preferred, product. Although I would not rule out the impact of the halo effect on the Burke study, I am satisfied that any halo effect concerns are minimal – the results themselves suggest that respondents were considering every question asked rather than adapting their responses to specific questions based on overall product preference.

13

Chambers was less persuasive in analogizing testing of size 4 diapers to Coca-Cola's market testing based only on 12 oz. cans. Clearly a consumable product like soda will not change perceptibly based on its packaging, whereas the "fit" of a given line of products will indeed be different. For instance, as P&G pointed out, the size and shape of blue jeans could change dramatically based on the size of the consumer, and not all sizes within a line could be expected to fit different-sized individuals. Still, KC selected size 4 because it is the most commonly-used size, and I was not persuaded by Bret Seitz's claims that the fit of diapers varies so drastically based on the different shapes of growing babies. I do not, in other words, find KC's extrapolation from size 4 data to be a significant limitation to the truth of its claims. Clearly more data based on other sizes would have been preferable, but neither ASTM nor the Lanham Act requires as extensive a test as P&G suggests.

As to P&G's own test, Chambers testified that there was some indicia of "dumping," meaning that consumers may have answered the single "fit" question in P&G's favor even though a "fit attribute" was not what was driving their opinion. In other words, because there was only one question asked, consumers who may have preferred P&G's diaper for *other* reasons might have responded that they had a better fit even if that was not their motivation. Although Chambers' concerns about dumping are persuasive in some limited sense, his suggestion that the entire test was unreliable on that score was not compelling. The fact that some of the respondents may have had additional thoughts or concerns (in addition to "fit") that they were not able to communicate through the study's single question merely means the answers from those individuals may be questioned, or suspect – it does not mean they were dumping. In all likelihood, as with the Burke study, most of the answers were legitimate rather than a reflection of some testing phenomena that skewed the results.

14

In sum, assuming consumer testing could establish the "truth" or "falsity" of the claim at issue here, the testimony and other evidence suggests to me that consumer preference as to the naturalness of the diapers' fit is a close call. Each side has raised legitimate but not disqualifying questions about the other's study, and each side's study supports its own viewpoint, albeit not by large margins. I am satisfied that neither study was conducted "perfectly," that is, in a fashion that would satisfy an expert panel of surveyors whose goal was to achieve the highest level of confidence attainable.[3] Still, the criticisms raised by both sides – in particular, the heavy focus on the halo effect – bordered themselves on unreliability: as suggested earlier, if consumers are so fickle that their own survey responses are swayed by such phenomena as dumping and halo effect, how can a Lanham Act falsity claim ever be premised on consumer preference surveys?

Ultimately P&G's Lanham Act claim fails because at the core of this dispute is an epistemological problem, namely, the problem of how one can ever "know" (much less *prove*) whether certain diapers "fit more naturally" than others. For that reason, I consider the claim to be puffery. And even if reasonable minds could agree on a determinative set of criteria for measuring the quality of naturally fitting diapers, the method of testing that question is fraught with peril – P&G would have us rely on what are essentially subjective judgments rendered by people who are not even the *users* of the products in question. Finally, even granting P&G's premise that consumer testing is a reliable means of proving or disproving a claim about natural fit, I conclude that the evidence does not tend to show it would be able to succeed in disproving the truth of KC's claim:

---

[3]I place almost no weight on the small-scale employee test KC conducted. Regardless of how the results are interpreted, it does not suffice to show that KC's claims are false or misleading. In short, I agree with Dr. Chambers that the study was "ridiculously small."

at best, it is a close question. Accordingly, I conclude P&G does not have a significant likelihood of success on the merits of its Lanham Act claim.

**IV. Irreparable Harm**

Finally, though not argued at any length by the parties, I also found little evidence of irreparable harm, and that reason alone suffices to justify denial of the motion for preliminary relief. The motion for preliminary relief comes some nine months after this case was filed, and there was credible and unrefuted testimony that ads such as the "Brick Baby" campaign have a limited lifespan. As such, much of the injury alleged has already occurred, which obviates the urgency for the drastic remedy that is preliminary injunctive relief.

Just as important was the testimony of P&G's own brand manager, whose testimony indicated that the damages his employer has sustained are calculable now and will be calculable in the future. This is not a case where P&G's products are being irreparably disparaged; it is, instead, a case about money, and that suggests both that an adequate remedy at law exists and that any harm P&G has suffered is remediable without injunctive relief.

Accordingly, because I find little chance of success on the merits and no indicia of irreparable harm, the motion for a preliminary injunction is **DENIED**.

**SO ORDERED** this      5th      day of August, 2008.

                                            s/ William C. Griesbach
                                            William C. Griesbach
                                            United States District Judge